IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASSANDRA COLLINS,
    Plaintiff,

                                  Case No. 4:99CV 483RH

v.

W.A. WOODHAM, individually and in his official
capacity as Sheriff of Gadsden County, Florida;
ALVAN PICKELS, individually and in his supervisory
capacity as Jail Administrator; and ROOSEVELT
BAKER, individually;
    Defendants.

## PLAINTIFF COLLINS' NOTICE OF SERVING AND FILING EXPERT REPORT

Plaintiff Cassandra Collins hereby gives notice of serving and filing the expert report of E. Eugene Miller, an expert penologist.

Respectfully submitted,

_____
RICHARD E. JOHNSON
Florida Bar Number 0858323
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 425-1997; 561-0836 fax

_____
JAMES V. COOK
Florida Bar Number 0966843
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 222-8080; 561-0836 fax

OFFICE OF CLERK
U.S. DISTRICT CT.
NORTHERN DISTRICT. FLA.
TALLAHASSEE, FLA.

00 JUN 30 PM 3: 43



— 57 —

I CERTIFY a true copy hereof was sent by ☐ hand ☐ fax ☑ mail on 6/30 2000, to:

Ms. Barbara Fromm, Esq.
Jolly, Peterson & Waters, PA
Post Office Box 37400
Tallahassee, Florida 32315

Ms. Gwen Adkins, Esq
Mr. John Cooper, Esq.
Mr. Harry Graham, Esq.
Cooper Coppins & Monroe
Post Office Box 14447
Tallahassee, Florida 32317-4447

JAMES V. COOK

EXPERT PENOLOGIST'S REPORT

RE

*CASSANDRA COLLINS v. W. A. WOODHAM, ET AL.*

Prepared by:

E. Eugene Miller
Washington, D.C.
June 27, 2000

## INTRODUCTION

I have been retained by James V. Cook, who is an attorney representing the plaintiff in the case of *Cassandra Collins v. W. A. Woodham, et al.*. I was asked to review various materials and documents and determine whether or not the Gadsen County Sheriff's Department and the Gadsen County Jail and their administrators and employees had acted in compliance with generally-accepted principles, practices and standards in the field of jail administration (penology) with regard to matters alleged in this lawsuit. Furthermore, in making my analysis I was asked to assume that the allegations made by the plaintiff, Cassandra Collins, are true. This is the only written report or opinion, which I have prepared for any purpose with regard to this case.

I respectfully reserve the right to amend this report, should I receive any additional, relevant information.

## METHODOLOGY

Prior to preparing this report, I reviewed the following documents and materials:

* The "Amended Complaint";
* Defendant Woodham's Answer;
* Defendant Pickels's Answer;
* Defendant Baker's Answer;;
* Plaintiff's Interrogatories, Requests for production and Admissions to Defendant Woodham;
* Defendant Woodham's Response;
* Plaintiff's Interrogatories, Requests for Production and Admissions to Defendant Baker;
* Defendant Baker's Response;
* Florida Department of Law Enforcement Investigation Reports, including summaries of interviews;
* *Florida Administrative Code*, Chapter 33-8, which was in force during the relevant time frames related to this case;
* Gadsen County Sheriff's Department, *Policy and Operational Procedures Manual*;
* Gadsen County Sheriff's Department, *General Operational*

> *Procedures and Policies*, Policy No. 9.0 "Sexual Harassment";
> * Personnel File of Captain Roosevelt Baker;
> * Personnel File of Major Alvan Pickels;
> * Jail File of Cassandra Collins;
> * "Declaration of Veronica Shaw Brady", dated 6-21-00;
> * "Plaintiff's Response to Defendant Baker's Interrogatories";
> * "Plaintiff's Response to Request for Documents";
> * Transcript of a telephone conversation between the plaintiff and Defendant Baker, dated July 20th or 21st;
> * American Correctional Association, *Standards for Adult Local Detention Facilities, 3rd edition;*
> * American Correctional Association, *1994 Standards Supplement;*
> * American Correctional Association, *National Jail and Adult Detention Directory, 1996 - 1998.*

In addition to a review of the preceding documents and materials, in preparing this report I am also relying upon my nearly thirty-six years of education, training and experience in the field of adult institutional corrections. (*Cf.* enclosed *curriculum vitae.*) It should also be noted that I have inspected many jails in Florida, including the old Gadsen County Jail, and am quite familiar with Chapter 33-8 of the *Florida Administrative Code*. I am also familiar with the literature on the growing abuse of women prisoners in jails and prisons in the United States, as well as with numerous actual instances of the sexual abuse of women inmates.

OBSERVATIONS, FINDINGS and OPINIONS

Initially, I would just like to note that the furlough involved in this case is unique in my experience. I am certainly extremely familiar with inmates, who are allowed to maintain a job outside a jail during the day and return to the facility at night. I am also quite familiar with furlough programs, which permit inmates to live at home and work or go to school in the community. But, this is the first furlough in my experience, in which the person worked in the jail during the day and then went home at night and, occasionally, for extended periods of time. It strikes me as being highly irregular that there seems to be no written authorization for this arrangement anywhere. Furthermore, the granting of this furlough by Captain Baker appears to have circumvented normal channels for granting furloughs within the jail, which, among others, normally

includes the classification officer, among others. Even Lieutenant Henry Miller, who had worked at the Gadsen County Jail for approximately 14 years and was normally involved in the furlough process, "stated that he does not remember any other inmate being allowed to work during the day and go home at night". (FDLE, "Investigative Report", interview summary, page 2) With regard to this highly unusual furlough, Major Pickels "knew that had been agreed to". (FDLE, "Investigative Report", interview summary, page 1)

Captain Baker has admitted to a number of violations of generally-accepted practices in the field. The following list of such violations is taken from "Defendant Baker's Response to Plaintiff's First Request for Admissions", and are listed here by page and item number:

| | |
|---|---|
| Page 2, #9 | endorsing a money order from Ms. Collins; |
| Page 2, #14 | called Ms. Collins at her home; |
| Page 2, #16 | had been to Ms. Collins's trailer/home; |
| Page 2, #19 | transported Ms. Collins in his official vehicle on non-business matters; |
| Page 2, #23 | picked her up in his official vehicle on I-10 on non-business; |
| Page 3, #25 | took plaintiff to pick up her car at the repair shop; |

Among many of the problems with the foregoing actions of Captain Baker is that, except in an emergency, a female employee should be involved in the transportation of a female inmate. The obvious reason for this is to protect the female inmate and the reputation of the male staff. It is also obviously improper for a male employee to transport a female inmate for non-business purposes. It is certainly improper conduct to do personal favors for inmates. This is (or should be) drilled into any jail employee from the moment they commence employment. "Different strokes for different folks" cannot help but eventually have negative ramifications for the employee, as well as sow the seeds of discontent within other inmates in the jail. It is also interesting to note that, despite these flagrant admissions of improper conduct (many, if not all, of which are also contained in the FDLE's "Investigative Report" ), Captain Baker was not disciplined appropriately by the Gadsen County Sheriff's Department.

The reason why you do not permit employees to engage in the kind of personal activities with an inmate, such as Captain Baker did with Ms. Collins, is to prevent an improper relationship from developing. This type of relationship can lead directly to the abuse of the inmate (particu-

-4-

larly of a female inmate at the hands of a male employee) due to the very nature of the authority, which one person inherently holds over the other. This is why many states have made it a felony for a jail staff member to engage in any kind of sexual activity with an inmate, whether or not it is "voluntary", because the very nature of the relationship, i.e., staff to prisoner, makes it impossible for such conduct to be truly "voluntary". This type of relationship can also jeopardize the security of the jail, by having the inmate pressure the staff member to smuggle in contraband or engage in other proscribed activities under threat of being exposed to superiors.

While Ms. Collins alleges that the money order was a bribe, Captain Baker asserts that it was the repayment of a loan. Either way, it is totally improper and inappropriate conduct on the part of Captain Baker. After the commencement of the FDLE investigation, Captain Baker told major Pickels about the loan. "When asked if loaning money to an inmate was a violation of any jail policy, Major Pickels stated that he was not aware of any procedure or policy at the jail that would prohibit such loans". (FDLE, "Investigative Report", interview summary, page 3) Major Pickels's assertion is absolutely right - apparently such improper conduct is not proscribed by any Gadsen County Jail or Gadsen Count Sheriff's Department policy. (Although such conduct would appear to violate the obvious intent of the *Florida Administrative Code*, specifically Chapter 33.8.003.(e), page 4560. It also violates a similar provision of the American Correctional Association's *Code of Ethics*. If the jail's administration is going to permit loans to inmates, then it should be a formal jail program, available to all inmates based on objective criteria. Otherwise, condoning such practices merely opens the door to blatant favoritism and fraternization. Nobody with years of experience in the management or oversight of a jail can be so naive as not to realize that. In fact, the jail's policy and procedure manual does contain provisions similar to that cited above in Chapter 33-8. Yet, even being aware that Captain Baker had violated by his own admission, no action was taken by either Chief Deputy Pickels or Sheriff Woodham.

There are several glaring omissions from the jail's and sheriff's department's policies and procedures and personnel rules. There appears to be nothing at all in the agency's personnel rules that prohibits accepting gratuities. At a bare minimum, either the "Personnel Rules" or the jail's policies and procedures should contain a specific prohibition against accepting gratuities.

Interestingly, the "Security and Control" section of the jail's policies and procedures does not contain any guidance or direction about transporting inmates. If all transporting of inmates is

-5-

performed by some other agency or entity, one would at least expect to find some mention of what to do to get the inmate ready for transport. If jail staff are ever called upon to transport inmates, then there should be a detailed procedure on how to do this, including a mandate for a female employee to be part of the transport, except in emergencies and if a female staff member is not available.

There is a personnel policy prohibiting the sexual harassment of staff. There is a policy in the jail manual about not doing anything to harm an inmate. But, there is nothing in the jail's policies specifically addressing so-called "cross gender" supervision issues or inappropriate conduct by staff towards members of the opposite sex. Nor is there any specific procedure about how a complaint of sexual misconduct by an inmate against a member of the staff should be handled. The reason for mentioning this is that by 1995 it was well known that the sexual abuse of female inmates in jails and prisons in the United States was increasing dramatically and had reached an alarming level. For example, the neighboring state of Georgia had experienced a major scandal with regard to the sexual abuse of women inmates, which became so notorious that it was even made the subject of a made-for-TV-movie. (I first learned about the scandal in the local press in Indonesia - the scandal received that much attention worldwide.) As a result of the Georgia scandal, a model procedure for dealing with complaints of sexual harassment by staff was developed and has been incorporated into the policies and procedures of other prison systems and jails. Furthermore, major human rights groups, including the United Nations, had begun studying the abuse of female inmates in America's prisons and jails and readily available reports were being issued. In brief, the problem was well known in the jail administration field. Hence, one would expect that there would be a specific prohibition against the sexual harassment and/or abuse of inmates in the policy and procedure manual as well as instructions to inmate either by means of the inmate handbook or during initial orientation in terms of what to do, if you are the victim of such unacceptable conduct.

Captain Baker's alleged proclivities to sexually harass female jail employees were well known. During FDLE's investigation of the plaintiff's allegations, several female jail officers described how they themselves had been harassed and/or how they had been warned by other staff that they would be so harassed by Captain Baker. Some of these descriptions were quite graphic and all were detailed. At least 2 female employees complained of this conduct to Major Pickels. No action was apparently taken as a result of these complaints, nor did anybody monitor Captain Baker's actions to see if he, in fact, was sexually harassing female employees. This

-6-

failure to act against Captain Baker or at least to let him know that his actions were being scrutinized obviously emboldened him to continue his activities. For example, after having complained to Major Pickels that she had been sexually harassed by then-Lieutenant Baker, Officer Sadonna Gray was called into Baker's office several days later. According to an FDLE summary of an interview with Ms. Gray, she alleges that Lieutenant Baker said :"I'll tell you frank and to the point, this is the way things are around here, if I can't fuck you one way, I'll fuck you another". There was another male officer in the office at the time. Obviously, Lieutenant, later Captain, Baker felt it had virtual impunity to act towards women under his authority in any manner, which he chose, no matter how vulgar or unwanted his advances and actions may have been.

There is also a report of an inmate, Vicki Smith having had sex inside the jail with a sheriff's department investigator about 5 times. The sex was "consensual". After Ms. Smith told several jail officials about this and that she wanted the sexual activity to stop, it did. There is no indication, however, that the sheriff's department employee involved in this misconduct was ever disciplined. (In a number of states at that time - but apparently not in Florida - that employee would have been guilty of a felony.)

Hopefully, nobody would argue that, if the plaintiff's allegations about being sexually assaulted on one occasion and raped on another by Mr. Baker are true, such conduct was not in patent violation of the law and of generally-accepted penological practices, principles and standards. Such conduct would be unconscionable under any circumstances with any woman, but particularly in this instance, given the very nature of the relationship between the Jail Administrator and an inmate, over whose life he had virtually total control.

One aspect of this sordid situation that has particularly distressed me is that a number of jail staff either knew or suspected that something was considerably amiss with regard to Captain Baker and Ms. Collins. At least some staff had personally experienced Captain Baker's sexual harassment themselves. Other staff knew about it. Numerous staff knew that Ms. Collins was receiving or at least appeared to be receiving special treatment. (The treatment was so special, in fact, that at least one or two jail staff thought that Ms. Collins was a civilian employee of the jail !) Yet, apparently nobody said anything about it. In effect, there was a conspiracy of silence that let this alleged situation progress from hints about sexual favors to outright rape, while all the while Captain Baker's conduct became more obvious and outrageous. Jail and law enforce-

-7-

ment personnel are generally anything but naive. Yet, at least some jail employees turned their heads and looked the other way from a growing and ever-more obvious problem; forget what was about to or had already happened to the inmate.

CONCLUSIONS

If the plaintiff's allegations are true, then Captain Baker's actions were unconscionable for any jail official. By his own admission and in numerous ways, he violated well-established, generally-accepted practices and principles in the field of jail administration (penology). His alleged continuous sexual harassment, sexual assault and rape of Ms. Collins are not only violations of proper penological practice, but also of the law and of standards of human decency as well.

Captain Baker's proclivities towards sexual harassment of women was well known in the agency. Apparently, complaints about this conduct by at least two female employees went uninvestigated nor was Captain Baker's performance monitored or scrutinized in any way to ascertain whether or not he was engaging in inappropriate behavior. Furthermore, the jail lacked appropriate policies and procedures governing such relevant issues as the transportation of women inmates and informing inmates of how to report sexual harassment by staff. Furthermore, when a sheriff's department employee was found to have been engaging in sex with an inmate inside the jail, apparently no disciplinary action was ever taken. The agency's response to these allegations, complaints and situations - all of which occurred prior to the alleged sexual assault and rape of Ms. Collins - created an atmosphere, in which Captain Baker obviously thought that he could get away with any sexual misconduct that he chose to engage in - and he was right. Despite all of the violations of generally-accepted jail practices that Captain Baker admitted to engaging in, no substantial disciplinary action was ever taken against him. Unfortunately, such inaction by the Gadsen County Sheriff's Department's administrators sends a message to other employees, as well. In effect, it gives the green light to engage in such conduct, because no adverse consequences will ensue.

In brief, what happened to Ms. Collins never should have occurred. Numerous people either saw or should have seen the final sordid chapter being written to the story, which was unfolding before their eyes. Nobody did anything at all to stop it. A pervasive climate of permissiveness

obviously existed and Captain Baker took full, unconscionable advantage of it. While Captain Baker may be the perpetrator of the events alleged by Ms. Collins, there are certainly others, who by their inaction, also share some of the blame for what happened.

## REMUNERATION

I am being compensated at the rate of $175.00 per hour to review various case materials and documents and to prepare this report. To-date, I have received a retainer of $700.00. There is no invoice currently outstanding.

E. Eugene Miller

CASES IN WHICH E. EUGENE MILLER
HAS TESTIFIED AT TRIAL IN THE LAST
FOUR YEARS

| DATE | CASE | COURT | JUDGE |
|---|---|---|---|
| 5/96 | Lloyd Hardy v. D.C. | D.C. Superior Court | Weisberg |
| 6/96 | Robert Franklin, et al. v. D.C. | U.S.Dist.Ct.,Wash.,D.C.; Judge Joyce Hens Green | |
| 12/96 | Patricia Harrison v. D.C. | D.C. Superior Court | |
| 4/97 | Blackwell, Lee & Quigley v. Singletary | U.S.Dist.Ct.,Tallahassee,FL. | Hinkle |
| 6/99 | Courning v. Mass. DOC | Suffolk Co. Superior Ct.,Boston | Barrett |
| 12/99 | Michael Bell v. Dade County | U.S.Dist.Ct.,Miami,FL. | Lenard0 |

# E. EUGENE MILLER

2501 Q Street, N.W.  (202) 965-1307
Suite 309
Washington, D.C. 20007

## EXPERIENCE:

**December 1973 - Present**  Criminal Justice Consultant

Services provided include: operational analysis of prison and jail operations in the areas of security, staffing, programs and classification; functional review of architectural designs; staff training; litigation advisor and expert witness.

**July 1984 - April 1992**  Vice President, C.M. Security Products, Inc.
Washington, D.C.

In charge of American subsidiary of C.M. Security Group, Ltd. - a manufacturer of building components and security equipment for the corrections and security fields. Specifically responsible for marketing, public relations and administrative functions.

**September 1978 - June 1984**  Director, Criminal Justice Services, The NBBJ Group
Seattle, WA

On a consultant basis was responsible for functional aspects of project design (jails, prisons, courts and police facilities) and criminal justice marketing for the firm's offices throughout the nation. Was extensively involved in six projects that were recognized by a joint committee of the ACA/AIA for their functional excellence.

**September 1975 - December 1979**  Faculty member (adjunct), School of Justice, American University
Washington, D.C.

Taught one course per semester, The Administration of Correctional Institutions, to undergraduate (primarily in-service) students majoring in criminal justice administration.

**December 1977 - August 1978**  Director, Jail Operations Project, National Sheriffs' Administration
Washington, D.C.

Responsible for all aspects of a National Institute of Corrections funded project with five distinct jail-related components.

**Spring 1974**  Co-Director, Advanced Institute of Correctional Administration, American University, Washington, D.C.

In conjunction with a colleague developed the curriculum, selected appropriate instructional and textual materials for and administered and taught a two-week institute for selected criminal justice officials from the federal government, five states, the District of Columbia and Japan.

**E. EUGENE MILLER**
Page Two

## EXPERIENCE:
(Continued)

**September 1973 -**    Superintendent (Acting), Massachusetts Correctional Institution at
**November 1973**    Norfolk

In charge of total operation of the largest prison in New England with 318 employees and 700 inmates.

**June 1973 -**    Chief Planner, Impact Program, Massachusetts Department of
**September 1973**    Corrections

Sole administrator of grant project, comprised of seven distinct parts that were carried out primarily on a sub-contractual basis. Supervised sub-contractors, provided technical assistance to them and coordinated with state and federal granting officials.

**September 1972 -**    Assistant Professor, Department of Administration of Justice and Public
**June 1973**    Safety, Virginia Commonwealth University, Richmond, VA

Taught all corrections courses offered by the department. Initiated and developed special projects with correctional agencies, including a three-day workshop for correctional officers selected from throughout the Virginia state prison system.

**May 1970 -**    Correctional Facilities Administrator, Alaska Division of Corrections
**July 1972**    Juneau, AK

Was responsible for total operation and coordination of six adults and two juvenile institutions. Also developed and administered federal grants and a capital projects budget. Supervised and enforced contracts with local jails; handled interstate institutional placement of adults; and, provided consultant services to local communities.

**September 1970 -**    Faculty member (adjunct), Juneau-Douglas Community College
**December 1970**    Juneau, Alaska

Taught a course in Criminology.

**February 1968 -**    Administrator, Women's Detention Center, District of Columbia
**May 1970**    Department of Corrections, Washington, D.C.

Was responsible for the complete operation of jail with staff of 65, 2,500 admissions per year. Also responsible for supervision of female parolees.

**E. EUGENE MILLER**
Page Three

## EXPERIENCE:
(Continued)

| | |
|---|---|
| September 1965 - February 1968 | **Program Development Specialist, District of Columbia Department of Corrections, Washington, D.C.** |

Successfully completed a wide variety of research, evaluation and sensitive "special" projects in support of the activities of the Assistant Director for Treatment and, subsequently, the Assistant Director for Planning and Research. Also coordinated with various District of Columbia and Federal agencies and professional organizations.

| | |
|---|---|
| January 1967 - February 1967 | **Consultant, District of Columbia Board of Parole Washington, D.C.** |

On loan from Department of Corrections to conduct management analysis of all administrative policies and procedures and to recommend and, in several instances, institute constructive changes.

| | |
|---|---|
| November 1964 - September 1965 | **Education Director, Bucks County Prison Doylestown, PA** |

On a volunteer basis planned, developed and implemented an education program at two adult institutions (a county jail and its separate work release center). Also carried a counseling caseload at the jail.

| | |
|---|---|
| September 1964 - July 1965 | **Teacher, Solebury School New Hope, PA** |

Taught Latin and Greek to high school students and also coached soccer and basketball.

## PUBLICATIONS:

### BOOKS

<u>Corrections in the Community</u>, co-authored with M. Robert Montilla, Reston Publishing Company, February, 1977.

<u>Jail Management</u>, D.C. Heath and Company, Lexington Books, June, 1978.

### MONOGRAPHS

<u>A Handbook on Jail Programs</u>, co-authored with James E. Murphy, National Sheriffs' Association, 1974.

<u>A Directory of State Jail Inspection Programs</u>, with Glen D. Skoler, National Sh... 'fs' Association, June, 1978.

**E. EUGENE MILLER**
Page Four

## PUBLICATIONS
(Continued)                                          **ARTICLES**

"Education at the Bucks County Prison", American Journal of Corrections, March - April, 1967.

"Continuity of Treatment in the District of Columbia", Correctional Psychologist, January - February, 1968.

"Changing Times", co-authored with John D. Case, National Jail Association Newsletter, January - February, 1968.

"The Women Participants in Washington's Riots", Federal Probation Quarterly, June, 1969.

"New Perspectives in the Education of Female Prisoners", co-authored with Rebecca Hughes, Journal of Correctional Education, Summer, 1969.

"Jails in Alaska", National Jail Association Newsletter, March - April, 1972.

"Ohio's Jail Dilemma", (Ohio) Cities & Villages, August, 1979.

"The New Jail Myth", American Jail Association's The Report, Winter, 1981.

"The People's Republic of China: Successful Reintegration", Corrections Today, December, 1982.

"Prison Industries in the People's Republic of China", The Prison Journal, Autumn - Winter, 1982.

"Good News/Bad News About Jails", Kentucky Associations' of Counties, County Viewpoint, August - September, 1983.

"New Building Approach for Correctional Facilities Does Not Sacrifice Security", co-authored with K. L. McReynolds, Corrections Digest, March 13, 1985.

"Innovative Expansion", co-authored with K. L. McReynolds, Corrections Today, April, 1986.

"Fire Deaths Result from Officer Carelessness, You Can Avoid Fatalities", Keepers' Voice, August, 1986.

"Rebuilding the Past - Renovation is a Viable Option", co-authored with Charles W. Cansfield, Corrections Today, July, 1987.

"Pretrial Detention in Papua New Guinea", American Jails, Fall, 1989.

**E. EUGENE MILLER**
Page Five

## PUBLICATIONS:
(Continued)

**ARTICLES**
(Continued)

"Corrections in Czechoslovakia", <u>American Jails</u>, March/April, 1991.

"Juvenile Justice in Germany", <u>Corrections Today</u>, April, 1991.

"Adult Detention in Vienna", <u>American Jails</u>, May/June, 1991.

## PROFESSIONAL AFFILIATIONS:

* Active member of American Correctional Association, the American Jail Association and The National Sheriffs' Association.

* Member, Subcommittee on Life Safety in Detention and Correctional Occupancies, Life Safety Committee, National Fire Protection Association, 1982 - Present.

* Member, Committee on Technology in Corrections, American Correctional Association, 1982 - 1984.

* Member, Committee on Adult Local Detention Facilities, American Correctional Association, 1988 - 1990.

* Member, Committee on Design and Technology, American Correctional Association, 1991 - ~~Present~~ /1993.

* Former member of the Board of Directors of the National Jail Association (six terms) and the Western Correctional Association (one term).

* Member, Board of Directors, Washington Halfway Home for Women, Washington, D.C., 1983 - ~~Present~~ /1992. President, 1985. (The Halfway House is accredited by the American Correctional Association).

* Listed in "Outstanding Young Men of America", 1976, 1978.

* Listed in "Who's Who in American Business Leaders", 1991, 1992.

## INTERNATIONAL EXPERIENCE

* Have visited prisons and/or jails in the following countries: Australia, Austria, Canada, China, Czechoslovakia, Germany, Hungary, Papua New Guinea and Singapore, et al.

* Member of United States delegation to international corrections conference in Sydney, Australia, 1988.

**E. EUGENE MILLER**
Page Six

## EDUCATION

M.S., Correctional Administration, American University, Washington, D.C., 1969.

M.A., Classical Languages, University of Wisconsin, Madison, WI, 1964

A.B., Classical Languages, College of the Holy Cross, Worcester, MA, 1963

In addition, have completed successfully numerous specialized institutes and courses in various aspects of correctional administration and public administration. Also participate in the principal conferences in the corrections field.

E. EUGENE MILLER
Page Seven

## ADDITIONAL PUBLICATIONS

### BOOK REVIEW

*Counties in Court: Jail Overcrowding and Court-Ordered Reform*, Wayne N. Welsh (author), reviewed in *American Jails*, January - February, 1997.

### ARTICLES

"Must the Buyer Beware ?", *American Jails*, January - February, 1995.

"Changes at the Store: Has Your Commissary Kept Up with Population Changes ?", *American Jails*, November - December, 1996.

"How to Make Better Purchasing Decisions", *Corrections Managers' Report*, August - September, 1997.

"Detention in South Africa", *American Jails*, September - October, 1997.

"Problems with "Time-Clock" Supervision of Inmates", *Corrections Managers' Report*, December, 1997 - January, 1998.

"Prisons in South Africa", *American Jails*, January - February, 1998.

"Fine-Tuning a New Jail Design", *Corrections Managers' Report*, October - November 1998.

"A Magic Wand for Inmate Supervision", *Correctional Security Report*, April - May, 1999.

"New Restraint Devices: A Cautionary Perspective", *Correctional Security Report*, June - July, 1999.

"Making More Use of Information to Improve Security and Accountability", *Correctional Security Report*, August - September, 1999.